**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| TERRANCE W. WURDEMAN,<br><br>Plaintiff,<br><br>v.<br><br>CLAY COUNTY, NEBRASKA; JEFF FRANKLIN, individually and in his official capacity as Clay County Sheriff; and KREIGHTON BAXTER, individually,<br><br>Defendants. | Case No. 4:26-cv-_______<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Terrance W. Wurdeman ("Plaintiff" or "Wurdeman"), for his Complaint against Defendant Clay County, Nebraska ("County"); Defendant Jeff Franklin, in his individual and official capacity ("Franklin"); and Defendant Kreighton Baxter, individually ("Baxter"), (collectively "Defendants") states the following in support of his claims arising under 42 U.S.C. § 1983 and the Family and Medical Leave Act and resulting from alleged retaliation for protected speech and political activity, alleged procedural due-process violations, and alleged interference with and discrimination concerning FMLA rights.

## I. NATURE OF THE ACTION

1. Terrance Wurdeman was a deputy sheriff in Clay County, Nebraska, for five and a half years with no disciplinary history.

2. On June 27, 2024, at a Nebraska State Patrol investigator's request, Wurdeman—off duty, unpaid, out of uniform, and using his personal vehicle and phone—provided information about a fellow deputy's failure to protect two children from an intoxicated driver and the Sheriff's Office's handling of that incident. He separately reported through the CCSO chain of command a citizen's complaint that the same deputy had misused a restricted criminal-justice database.

3. In August 2024, after Sheriff Franklin announced he would not seek re-election, Wurdeman told the Sheriff that people in the community were asking him to run for Sheriff and that he was considering it. The Sheriff was backing Wurdeman's supervisor, Kreighton Baxter, to succeed him.

4. Wurdeman suffered retaliation including exclusion from training, suspension without pay, termination, and a state certification report that resulted in his law-enforcement certification being locked.

5. On September 17 and October 4, 2024, Wurdeman was the only deputy excluded from department training.

6. On October 22, 2024, the County suspended Wurdeman without pay and without written notice.

7. On October 28, 2024, the County fired Wurdeman by telephone within minutes after he delivered a written grievance invoking the First and Fourteenth Amendments. Sheriff Franklin later rescinded that suspension and termination in writing, restored 100 hours of back pay, and ordered Wurdeman to report for

work, only to meet him at the door on November 11 with paid administrative leave based on the same core allegations. The County then gave Wurdeman less than twenty-four hours' notice of a December hearing as originally scheduled; the rescheduled hearing lasted approximately nine minutes; and the Sheriff terminated him that afternoon by a letter stating no finding or reason.

8. On or about October 30, 2024, the Sheriff's Office reported to the State of Nebraska that Wurdeman had left employment for reasons that could be grounds for revoking his law-enforcement certification. That report locked his certification. It has never been corrected, even after the Sheriff rescinded the firing on which it was based.

9. As a direct and proximate result of Franklin's report to the State of Nebraska, Wurdeman has been unable to work as a law-enforcement officer anywhere in Nebraska since October 30, 2024.

10. Wurdeman alleges that he was denied meaningful procedural protections before and after the first suspension and termination and again before the final termination as the County did not convene the Grievance Board described in the County Handbook after Wurdeman invoked the grievance process.

11. Wurdeman alleges that Sheriff Jeff Franklin exercised final authority over deputy discipline, termination, and the CCSO separation report sent to the State.

12. Chief Deputy Kreighton Baxter participated in the investigation, excluded him from training, suspended him without pay, and initiated the first termination.

13. The stated reason for Wurdeman's termination was pretextual "timekeeping" based on false alleged discrepancies involving roughly forty-four (44) hours, over three (3) months, measured by comparing payroll clock-ins recorded in the County's phone application with separate radio-dispatch timestamps.

14. Those systems served different purposes: the phone application recorded payroll time, while radio and MACH status communicated a deputy's availability and location to dispatch.

15. No written CCSO policy required the timestamps to match, and before radioing in, Wurdeman was preparing for County work by putting on the required uniform and duty gear, readying the County's vehicle and equipment, completing County-assigned online training, and handling work calls, and he was expected to respond if a law-enforcement matter arose.

16. In contrast to Wurdeman's treatment, a deputy Wurdeman had reported in writing for sitting at home for up to six hours of a ten-hour shift was never disciplined and remains employed.

17. In further contrast to Wurdeman's treatment, the supervisor who suspended Wurdeman used the supervisor's patrol vehicle to take the supervisor's

children to school on the clock, asked on-duty deputies to feed the supervisor's dog, and sat at home for hours during the supervisor's own shifts.

18. This action seeks relief under 42 U.S.C. § 1983 for retaliation against Wurdeman by Defendants in violation of the First Amendment, for Defendants' deprivation of Wurdeman's liberty without due process of law in violation of the Fourteenth Amendment, and for Defendants' retaliation and discrimination against Wurdeman under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

## II. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and 29 U.S.C. § 2617(a)(2).

20. Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in Nebraska and the events giving rise to the claims occurred in Clay County, Nebraska. Pursuant to NECivR 40.1(b), Plaintiff requests Lincoln, Nebraska, as the place of trial.

## III. PARTIES AND RELEVANT ACTORS

21. Plaintiff Terrance W. Wurdeman is a citizen of Nebraska residing in rural Kenesaw, Nebraska. He is a veteran of the United States Armed Forces and a Nebraska-certified law-enforcement officer, certified since 2013. Clay County employed him as a deputy sheriff from May 20, 2019, until December 20, 2024.

22. Defendant Clay County, Nebraska (the "County") is a political subdivision of the State of Nebraska. The Clay County Sheriff's Office ("CCSO" or

the “Sheriff’s Office”) is a department of the County. The County employed Wurdeman, paid his wages through the County Clerk, adopted the Clay County Employee Handbook that governed his employment, and retained the outside human-resources firm and outside counsel who participated in the decisions described below.

23. The County is a “person” subject to suit under 42 U.S.C. § 1983 and a “public agency” and “employer” under 29 U.S.C. § 2611(4).

24. Defendant Jeff Franklin (“Franklin”) was at all relevant times the elected Sheriff of Clay County. Under Nebraska law the Sheriff appoints deputies and may revoke their appointments, Neb. Rev. Stat. § 23-1704.01, and under the County’s Employee Handbook and the Sheriff’s own written notices to Wurdeman, the Sheriff was the official who decided what discipline, up to and including termination, would be imposed on a deputy. Franklin participated in discipline and termination decisions involving Wurdeman and caused or authorized the state certification report. Franklin is sued in his individual capacity for damages and in his official capacity for prospective relief. Franklin acted under color of state law at all relevant times.

25. Defendant Kreighton Baxter (“Baxter”) was at all relevant times a supervisory officer of the CCSO. He held the rank of Sergeant and then Lieutenant during 2024 and became Chief Deputy after the resignation of Chief Deputy Sean Julich in August 2024. Baxter personally suspended Wurdeman without pay on October 22, 2024, initiated the telephone call on which Wurdeman

was fired on October 28, 2024, took possession of Wurdeman's duty equipment that day, participated in the investigation and hearings that followed, and controlled Wurdeman's access to training. Baxter is sued in his individual capacity as he acted under color of state law at all relevant times.

26. Sean Julich ("Julich") was a former CCSO Chief Deputy who allegedly confronted Wurdeman after Wurdeman's communications with the Nebraska State Patrol.

27. Clay County retained nonparty Zelle, LLC, doing business as Zelle Human Resource Solutions ("Zelle"), on a continuing monthly basis to provide outsourced human-resources services. The County directed employees to Zelle for HR and leave administration and used Zelle in employee complaints, workplace investigations, discipline, grievances, and termination. Zelle's conduct described below was undertaken as the County's retained HR agent.

28. Nonparty Jordan Arndt ("Arndt"), Zelle's consultant assigned to Clay County, acted as the County's HR representative during the events alleged below.

29. Arndt received Wurdeman's written retaliation complaint, communicated with Franklin about Wurdeman's written retaliation complaint, participated personally in Wurdeman's October 22 suspension and October 28 termination, undertook to convene the County Grievance Board, and participated in the investigation that produced the later charges against Wurdeman which culminated in termination of Wurdeman's employment.

## IV. FACTUAL ALLEGATIONS

### A. Wurdeman's employment and the County's repeated promises of accommodation

30. Wurdeman served roughly seven years in the United States military, where he sustained hip and lumbar-spine injuries that limit his ability to run, sit for extended periods, and engage in prolonged physical confrontation.

31. Wurdeman has worked in law enforcement since 2013, including at the Nance County and Knox County Sheriff's Offices.

32. The CCSO hired Wurdeman as a deputy on May 20, 2019, with full knowledge of his service-connected injuries and the likelihood of future surgeries.

33. Wurdeman signed the Nebraska Law Enforcement Officer Code of Ethics.

34. Wurdeman served as the department's evidence technician and was the deputy others asked to use when a clean patrol vehicle was needed for transports.

35. Wurdeman had hip surgery in October 2020 and took approved FMLA leave through January 2021. His physical limitations continued.

36. On March 30, 2022, unable to perform full night-shift patrol duties, Wurdeman submitted a letter of resignation. Sheriff Franklin and then-Chief Deputy Julich asked him to stay and promised to move Wurdeman to day shift and to administrative duties compatible with his injuries (court security, civil process, evidence, and sex-offender-registry work).

37. Franklin told Wurdeman he did not want to lose a deputy in an election year because his opponent was campaigning on the department's inability to stay fully staffed.

38. Wurdeman withdrew his resignation in reliance on Julich and Franklin's promises.

39. From March 2022 through his termination, the promised day-shift assignment and accommodation were never provided to Wurdeman.

40. Franklin and Julich, and later Baxter, repeated the promise of a day-shift move or a promotion on several occasions, including at a meeting on August 28, 2024, described below.

41. In his five and a half years with the CCSO, Wurdeman received no written discipline of any kind before October 22, 2024.

**B. Wurdeman reported misconduct by other deputies**

42. Beginning in late 2023, Wurdeman reported misconduct by fellow deputies through the CCSO chain of command.

43. In November or December 2023, while parked with then-Lieutenant Paul Fujan during a winter storm, Wurdeman reported that Deputy Dillon Hall was going home during his shifts and sitting there for hours while on the clock;

44. Fujan indicated to Wurdeman that he personally observed Hall doing so.

45. In January 2024 Wurdeman reported to Baxter that Hall had taken a controlled substance from a case and posted it on Snapchat without logging it into evidence.

46. In March 2024 Wurdeman documented, and reported to Baxter in writing by text message with a screenshot of the County's MACH vehicle-location system, that Hall was going home for several hours every shift, on one occasion for six hours of a ten-hour shift, and was disconnecting his MACH unit while at home.

47. Baxter responded that he would "look into it," but no action was taken.

48. Hall was never disciplined for any of this and remains employed by the CCSO.

49. In May 2024 Wurdeman returned from vacation to learn that Deputy Taylor Jacobs was under investigation for a second domestic-abuse matter and was still working the road. That investigation followed the June 2023 child-safety incident described below.

50. The County's outside human-resources consultant, Zelle, had recommended suspension; however, Jacobs was not placed on administrative duty until June 7, 2024, and then only after Hall complained to Julich and the Nebraska State Patrol ("NSP") told Julich that it would have suspended Jacobs. Even then Jacobs was permitted to come to the office in plain clothes and sit on his phone while being paid.

51. Wurdeman previously reported that on June 3, 2023, Jacobs, while off duty, attempted to telephone Hall to report that an adult man known to Jacobs

was at Jacobs's residence, intoxicated, and about to drive away with two minor children. Jacobs did not contact dispatch or Wurdeman, both of whom were available, and did not prevent the driver from leaving with the children. Hall returned Jacobs's call and, being nearby, stopped the vehicle within approximately three blocks; Wurdeman assisted at the stop. The two minor children were unrestrained. The driver admitted drinking, displayed signs of impairment, and produced a preliminary breath-test reading of .127. He was arrested for driving under the influence, child-restraint violations, and operating a motor vehicle with a child under sixteen while intoxicated. The Clay County Attorney later dismissed the charges. At the jail the driver complained that Jacobs had allowed him to drive away despite believing he was intoxicated. Wurdeman reported Jacobs's failure to intervene to Lieutenant Paul Fujan.

**C. The June 2024 NSP meeting and the separate NCJIS report**

52. On June 25, 2024, NSP contacted CCSO dispatch seeking contact information for deputies who might have information concerning Jacobs. Dispatch sent a general message stating that it had provided their information to NSP Investigator Henry, who also emailed Hall that day.

53. On June 27, 2024, at approximately 2:00 p.m., Wurdeman and Hall met with Investigator Henry at the Hastings Police Department. Wurdeman was off duty, unpaid, and out of uniform. He drove his personal vehicle and used his personal phone for the communications, except for the initial email used to establish contact. No CCSO supervisor assigned, directed, authorized, or approved

their participation. Wurdeman described his personal observations during the June 3 traffic stop and at the jail, Jacobs's failure to contact dispatch or intervene, and Wurdeman's report to Fujan.

54. On June 28, 2024, Wurdeman learned from a citizen that Jacobs appeared to be using the Nebraska Criminal Justice Information System ("NCJIS"), a restricted law-enforcement database, to look up the citizen's driving and criminal history for the benefit of a woman with whom Jacobs was in a personal relationship, for use against the citizen in a private dispute.

55. NCJIS access is restricted to authorized criminal-justice purposes, and obtaining or disclosing motor-vehicle-record information for a private dispute is generally prohibited by the federal Driver's Privacy Protection Act, 18 U.S.C. § 2721 et seq.

56. Wurdeman immediately reported the suspected NCJIS misuse to Baxter and Franklin and prepared a written report for the CCSO administration to refer to NSP.

57. Wurdeman did not himself report the NCJIS matter to NSP and does not know whether the CCSO forwarded it.

58. Jacobs later resigned before any discipline was imposed.

59. Wurdeman's June 27 communications with NSP were not part of his job duties.

60. Wurdeman's assigned duties as a Clay County deputy were road patrol, calls for service, and enforcement of the criminal laws against the public.

61. Under CCSO policy and practice, investigation of allegations against a CCSO deputy was the responsibility of the Sheriff and the Chief Deputy, not of a line deputy, and Wurdeman was never assigned to investigate Jacobs.

62. The CCSO had no policy or practice requiring or authorizing a deputy to report a colleague to an outside agency; the County's own Employee Protection Policy directs an employee who believes a County practice violates the law to file a written complaint with the County Clerk, and says nothing about outside agencies.

63. The CCSO was not a neutral party to NSP's inquiry and its response to Jacobs's conduct was part of the subject matter.

64. Wurdeman did not initiate NSP's inquiry, investigate Jacobs for NSP, gather records or evidence for NSP, or exercise any CCSO authority. He answered an outside investigator's questions about events he had personally observed, outside the chain of command and without any CCSO assignment or approval.

65. Wurdeman's separate written NCJIS report to the CCSO administration was an internal report and was not part of his June 27 communications with NSP.

66. The safety of children, the integrity of county law-enforcement officers, the handling of alleged misconduct by a deputy, and the suspected misuse of a restricted criminal-justice database for private ends are matters of public concern.

**D. Retaliation against Wurdeman by Chief Deputy Julich**

67. Julich and Jacobs were close friends.

68. On July 1, 2024, Julich confronted Wurdeman in front of the dispatch office and berated him for "going around his back" by speaking with NSP about Jacobs.

69. On July 11, 2024, Wurdeman told Franklin that Julich had directed Fujan to withhold the evidence-vault keys from Wurdeman, the department's evidence technician, so that Wurdeman could not carry out an inventory Franklin himself had ordered. Franklin said he would speak to Julich.

70. On July 12, 2024, Julich called Wurdeman, who was off duty, and then came to Wurdeman's home uninvited where Julich accused Wurdeman of being "the problem" in the department and of causing "turmoil," raised the NSP matter and Jacobs's suspension, and pressed Wurdeman to serve civil process in a manner Wurdeman believed was unlawful.

71. Franklin later confirmed to Wurdeman that Julich had come to the house after Franklin confronted Julich about withholding the evidence-vault keys from Wurdeman.

72. On July 26 and July 29, 2024, Franklin came to Wurdeman's residence while both Franklin and Wurdeman were off duty.

73. On July 30, the last day Wurdeman's parents were helping install siding at the residence, Franklin again came to the home while Wurdeman was off duty. Although the family said they were busy and tried to end the conversation, Franklin continued talking and would not leave. Franklin told Wurdeman's father

that he had Julich "keeping [Wurdeman] in line." Wurdeman's mother, wife, and Wurdeman witnessed the statement.

74. On or about July 15, 2024, Wurdeman prepared a written cease-and-desist letter to Julich documenting the retaliation, the hostile treatment, and the false statements Julich had made about him to other deputies.

75. Before delivering the cease-and-desist letter, Franklin told Wurdeman not to give it to Julich and to give it to Baxter instead.

76. On July 22, 2024, Baxter, who had organized a meeting between several deputies, Franklin, and Julich about Julich's conduct, texted Wurdeman that Julich had shown him a text "asking to come over and talk to you" on July 12, that Wurdeman's "cease and desist thing" was not going to "fly much," and that Franklin and Julich were "backing" Baxter to run for Sheriff. Baxter also reported that in the meeting Julich and Franklin had "both backed me for Sheriff" and that another deputy witnessed it.

77. On August 9, 2024, having received no response from Franklin or Baxter, Wurdeman contacted Zelle from his residence on his personal phone and sent the cease-and-desist letter through his personal email to Zelle at the request of its assigned consultant, Arndt. Wurdeman was off duty. He used personal means because Zelle operated during the day while Wurdeman worked nights.

78. The letter documented Julich's retaliation after Wurdeman spoke with NSP, the hostile treatment, and the false statements Julich had made about him to other deputies.

79. Arndt met with Franklin about the complaint and arranged to meet with Julich but, before that meeting occurred, Julich resigned.

80. On August 16, 2024, Arndt confirmed to Wurdeman in writing that Zelle had been informed of Julich's resignation before it could speak with him.

81. After receiving Wurdeman's August 9 written complaint of retaliation for speaking with NSP, Arndt participated in the HR process through which the County suspended Wurdeman without pay, terminated Wurdeman's employment for the first time, promised to address Wurdeman's grievance, renewed the County's investigation of Wurdeman, placed Wurdeman on paid administrative leave, and effectuated the second and final termination of Wurdeman's employment.

**E. Wurdeman informs Sheriff of intent to run for Sheriff**

82. In or about August 2024 Franklin announced that he would not seek re-election as Sheriff in 2026.

83. Baxter, by his own account to Wurdeman, was the candidate Franklin and Julich were backing to succeed him.

84. On August 27, 2024, Baxter asked Wurdeman to attend a meeting with Baxter and Franklin the following day.

85. At the August 28 meeting, Franklin and Baxter asked whether Wurdeman intended to stay with the department now that Julich had resigned, told Wurdeman Julich's conduct had not been condoned, and again offered Wurdeman either a day-shift move or a promotion to a supervisory position.

86. While discussing Jacobs, Franklin acknowledged, "You were pushing what Jacobs was doing wrong." Franklin then raised the upcoming Sheriff's election and discussed Wurdeman and Baxter as possible candidates.

87. Because Franklin had raised the election during the meeting, immediately after the meeting Wurdeman told Franklin that his name was being mentioned around the county as a candidate for Sheriff and that he was seriously considering running.

88. Franklin responded by encouraging multiple deputies to run because another prospective candidate was considering the office.

89. Franklin expressed no concern, then or at any time before this suit, that a deputy's candidacy or interest in candidacy would disrupt the office or divide its deputies.

90. Wurdeman continued to work his shifts for the next eight weeks without incident of any kind.

91. None of the County's later written notices, findings, or letters mentioned the election, the candidacy, or the operation of the office.

92. Wurdeman's statement that he was considering running for Sheriff was speech as a citizen on a matter of public concern. It was not made pursuant to any job duty.

93. Franklin was not a candidate, so Wurdeman's prospective candidacy threatened no interest of Franklin's in his own re-election; it threatened only the succession plan Franklin and Julich had arranged for Baxter.

**F. Wurdeman's exclusion from training**

94. Before August 28, 2024, Wurdeman attended department training on the same footing as every other deputy.

95. After August 28, 2024, Wurdeman was the only deputy excluded from department training.

96. On September 17, 2024, the CCSO conducted Taser certification training. The date of CCSO's Taser certification training was withheld from Wurdeman until Fujan inadvertently disclosed it the week of the training and told Wurdeman he was the only deputy not allowed to attend.

97. After the other deputies completed CCSO Taser certification training, Baxter texted Wurdeman that he "could come into the meeting now."

98. On October 4, 2024, the CCSO conducted active-shooter and lockdown-drill training at Harvard Public Schools with the Harvard Police Department and the County's emergency-management office.

99. Every other deputy except Wurdeman was reminded of the date, time, and location of CCSO's active-shooter and lockdown-drill training a day or two in advance.

100. Baxter refused to give Wurdeman the time or place of CCSO's active-shooter and lockdown-drill training.

101. The CCSO's public Facebook post about the CCSO's active-shooter and lockdown-drill training exercise pictured the department's deputies, of which Wurdeman was not shown.

102. In October 2024 the CCSO conducted handgun qualification during the day shift.

103. Every deputy except Wurdeman was invited to CCSO's handgun qualification.

104. Wurdeman was later required to conduct CCSO handgun qualification separately during rifle qualification on October 22, 2024, with a single attempt where other deputies had two attempts.

**G. Wurdeman's Unanswered October 22, 2024 FMLA request, suspension without pay and denial of due process**

105. On the morning of October 22, 2024, on his way to rifle qualification, Wurdeman went to the County Clerk's office and asked for FMLA paperwork so he could arrange leave for the anticipated December 6 birth of his child and to care for and bond with the child after birth.

106. A Clerk's-office employee told him that the office could not provide the paperwork and directed Wurdeman to Zelle, the County's designated outside-HR agent.

107. Wurdeman immediately called the designated outside-HR number, received no answer, and left a voicemail explaining his need for birth-and-bonding leave.

108. By directing employees to that number, the County selected Zelle as its channel for receiving leave requests.

109. Wurdeman gave notice through the precise channel the County required before the County suspended him later that day, on October 22, 2024.

110. No one returned Wurdeman's call or provided the forms or required notices.

111. At the qualification, Baxter told Wurdeman there was an email requiring him to attend a meeting with "HR" at 1:00 p.m., but Baxter refused to say what the meeting was about.

112. Wurdeman asked Franklin directly whether the meeting was disciplinary, explained that given the hostility directed at him he wanted counsel present if it was, and Franklin told him he had "no clue" what it concerned and that "everyone is keeping him out of the loop."

113. Franklin had in fact initiated the investigation with Baxter weeks earlier, as the County's December 17, 2024 hearing notice later admitted.

114. At the 1:00 p.m. meeting Baxter and Zelle HR consultant Arndt told Wurdeman that his phone-application clock-in times did not match the times he radioed dispatch that he was on duty.

115. Wurdeman explained to Baxter and Arndt that the phone application was the County's payroll system, while radio and MACH status were operational systems used to communicate availability and location to dispatch, and the systems did not record the same event, and no written CCSO policy required their timestamps to match or identified radio sign-on as the beginning of paid work.

116. Wurdeman explained to Baxter and Arndt that he had followed the same practice for five years without objection; that during the disputed intervals he put on the required uniform and duty gear, readied the patrol vehicle and equipment, completed County-assigned online training, cleaned his vest, and handled work calls; and that he was on-call and expected to respond if a law-enforcement matter arose while he prepared for the shift.

117. Wurdeman further explained to Baxter and Arndt that his radio frequently failed, requiring him to check in at dispatch in person, and that dispatch itself often failed to log on-duty times accurately and simply recorded the scheduled shift start.

118. Wurdeman also explained to Baxter and Arndt that the MACH location unit in his vehicle repeatedly lost connectivity, that he had reported the problem to Baxter, to the County's information-technology employee, and to dispatch on numerous occasions, in writing and in person, and that his requests to fix it had been ignored.

119. Wurdeman asked Baxter and Arndt for documentation supporting the accusations against him so he could respond to them.

120. Baxter refused to provide documentation supporting the accusations against Wurdeman.

121. Arndt stated that the investigation was not complete and that HR would "continue looking into everything."

122. Arndt then asked Baxter whether he wanted Wurdeman suspended without pay to which Baxter responded affirmatively.

123. Wurdeman was suspended without pay on the spot.

124. Wurdeman was given nothing in writing, was not asked to sign anything, and was never provided with the documentation he requested.

125. The Clay County Employee Handbook (effective January 1, 2024) (the "Handbook") governs the discipline of County employees, including deputies.

126. The Handbook provides that an elected official "may suspend any employee with pay for a period of time pending the outcome of an investigation into a complaint or possible policy violation" and "will notify the employee, in writing, of the reasons for the action and the number of days of suspension."

127. The Handbook further provides that an elected official "may suspend any employee without pay for a period not exceeding sixty (60) calendar days in any twelve (12) month period," that "no single suspension will normally be for more than thirty (30) calendar days," and that the official "will notify the employee, in writing, of the reasons for the action and the number of days of suspension."

128. The Handbook further provides that an employee who is suspended or terminated "has the option to file a grievance, following the procedure outlined in the policy entitled 'Grievance Procedure.'"

129. The Handbook's Grievance Procedure (Section 2.6) requires the elected official to "respond to the grievance, in writing, normally within ten (10) working

days from the date of receipt of the grievance," and gives the employee the right to appeal that response to the County Grievance Board, which "will conduct a hearing concerning the grievance within five (5) working days from receipt of the appeal."

130. The Handbook's Grievance Procedure provides that the Grievance Board's decision "is final."

131. The Handbook's Law Enforcement Wage and Hour Policy (Section 4.6a) provides that if deputies "forget to clock in or clock out or discover an error, they must contact the County Clerk," and that discipline "may also result if employees repeatedly forget to record their time or falsify a timecard."

132. The Handbook does not state that a deputy may record work time only after radioing dispatch or logging into MACH, or that radio, MACH, and payroll timestamps must match.

133. The same Handbook policy provides that deputies "may use County vehicles for personal purposes only when they are on call and only after notifying the County Sheriff/Supervisor."

134. The Handbook's Employee Protection Policy (Section 2.4) provides that "[a]ll employees are protected from victimization, harassment, or disciplinary action as a result of any disclosure, where the disclosure is made in good faith and is not made maliciously or for personal gain."

135. The Handbook's Political Activity policy (Section 8.14) provides that "[e]mployees are prohibited from using their official authority or influence to

further the cause of any political party or candidate for nomination or election to public office," that "[a]ll employees have the right to protection from political coercion of any type from any person," and that "[a]ll employees have the right to vote as they choose and to express their opinions in an appropriately respectful and non-disruptive manner on political subjects and candidates."

136. Nebraska law similarly provides that, unless another law specifically restricts it, no employee of a political subdivision may be prohibited from political activity except during office hours, while performing official duties, or while wearing a required uniform. Neb. Rev. Stat. § 20-160.

137. On October 22, 2024, Wurdeman received no written notice of the accusations, no supporting documentation, no opportunity to present evidence, no hearing, no written decision, and no appeal process before the County suspended him without pay.

**H. The County Board President tells Wurdeman he will be fired**

138. On October 24, 2024, Wurdeman went to the residence of L. Wayne Johnson, the President of the Clay County Board of Commissioners ("Johnson"), to complain about the retaliation through the Handbook's designated channel for a complaint against an elected official, but Johnson was out of town.

139. On October 27, Wurdeman reached Johnson by telephone, wherein Johnson said he was aware of Wurdeman's situation, told Wurdeman to "let the cards fall where they may," said "it was nice working with" him, and, when

Wurdeman said the retaliation was connected to his possible candidacy for Sheriff, Johnson responded, "we all know that is not true."

140. Johnson also said it was not his department and he could do nothing for Wurdeman despite no hearing or formal decision announced.

**I. Wurdeman's October 28, 2024 grievance and first termination**

141. On October 28, 2024, Wurdeman hand-delivered a written grievance to Franklin asserting that Wurdeman's suspension violated Nebraska statutes, Wurdeman's First Amendment right to free speech, Wurdeman's Fourteenth Amendment right to due process, and CCSO discipline and grievance policies, resulting from the absence of notice, an opportunity to respond, or a hearing, and requested reinstatement, back pay, and removal of the discipline from his file.

142. Wurdeman's October 28, 2024 Grievance demanded a written response within five business days and reserved the right to pursue additional legal remedies.

143. Franklin read the grievance.

144. Baxter then took over the meeting and telephoned Arndt at Zelle HR from his own phone.

145. Over that call Wurdeman was told he was terminated and that HR would mail him his insurance and termination paperwork.

146. Wurdeman asked how it was permissible for other deputies to sit at home on the clock for hours at a time and was informed that those absences were "lunch breaks."

147. Wurdeman was told the hours he had been accused of were in fact wrong because some had turned out to be training.

148. Wurdeman again requested supporting documentation and was told he would receive it.

149. Wurdeman never received supporting documentation.

150. Baxter signed the form taking possession of Wurdeman's firearm, Taser, rifle, vehicle, computer, radio, keys, and uniform that day.

151. Wurdeman was fired within minutes after he delivered a grievance asserting his constitutional rights, without written notice of any charge, without a hearing, and while the County's own consultant had acknowledged six days earlier that the investigation was incomplete.

**J. October 30, 2024: the County reports Wurdeman to the State and Wurdeman's certification is locked**

152. Nebraska law requires the head of a law-enforcement agency to submit a personnel change-in-status form within seven days after an officer leaves employment and to make a separate report to the Nebraska Commission on Law Enforcement and Criminal Justice when an officer is terminated for conduct that could support suspension or revocation of certification. Neb. Rev. Stat. § 81-1414.15(1), (4).

153. Within two days of Wurdeman's October 28 telephone termination, and before Wurdeman had received any written charge or any hearing, the CCSO submitted a "Change in Status" form (a "791 report") to NLETC stating that

Wurdeman had been terminated and that the reasons he left employment "could possibly be grounds for revocation" of his certification.

154. By letter dated October 30, 2024, the NLETC Director informed Wurdeman that as a result of the CCSO's report "your status as a law enforcement officer has been locked," that "you cannot be employed as a law enforcement officer in the State of Nebraska" until a determination is made, and that any future law-enforcement employer would be given access to all of his personnel records.

155. The CCSO made that report to the State knowing that Wurdeman had been provided no hearing, that Zelle's investigation was by its own account incomplete, and that Wurdeman had that same week formally disputed the accusations in writing.

**K. Sheriff's November 7, 2024 rescission of Wurdeman's first suspension and the termination**

156. On October 30, 2024, Arndt emailed Wurdeman that a grievance board would be convened and asked him to identify two individuals and available dates.

157. Wurdeman promptly proposed two Grievance Board members and supplied available dates.

158. The County never convened the Board or contacted Wurdeman again about it.

159. Instead, by letter dated November 7, 2024, signed by Franklin and transmitted by Baxter, the Sheriff wrote: "After reviewing your October 28, 2024,

grievance regarding your suspension without pay, I have made the decision to rescind your suspension without pay and termination. You will be paid for the shifts you missed from October 22, 2024 (the date you were suspended) through November 8, 2024. These hours (100 total) will be paid on your next paycheck. Please report back to work for your next regularly scheduled shift, which is on Monday, November 11 at 9 am."

160. Prior to the grievance, Wurdeman worked nights and had no regularly scheduled shift at 9:00 a.m.

161. The November 7 letter nevertheless rescinded the October 22 suspension and October 28 termination in full, restored 100 hours of back pay, and directed Wurdeman to report at an hour selected by the Sheriff.

162. Neither Franklin, Baxter, nor the County corrected or withdrew the 791 report on which Wurdeman's certification had been locked, although the Sheriff had now rescinded, in writing, the termination that report described as the basis to lock Wurdeman's credentials.

**L. Wurdeman's November 11, 2024 reinstatement and re-suspension**

163. On Monday, November 11, 2024, Wurdeman reported to the CCSO at 9:00 a.m., as directed.

164. Franklin met him at the door, told him to sit, and handed him a document titled "Notice of Possible Disciplinary Action Impacting Rank, Pay, or Employment Status" placing him on "non-disciplinary, paid administrative leave" pending further investigation.

165. Wurdeman was never returned to duty.

166. The November 11 Notice accused Wurdeman of the same timekeeping conduct for which he had been suspended and fired in October, repackaged as violations of Clay County Employee Handbook policies 4.1, 4.3, 4.6a, and 8.2, the CCSO Patrol policy, a "verbal directive" allegedly given by Franklin and Julich on December 20, 2021 regarding the MACH system, and the Nebraska Law Enforcement Officer Code of Ethics.

167. The November 11 Notice asserted "approximately 44 hours of unaccounted work time" over four months and characterized Wurdeman's explanation on October 22 as an "admission."

168. The November 11 Notice added new accusations that had not been raised to Wurdeman in October; specifically, that Wurdeman "rarely" arrived first to calls, that he "refused to assist and back-up a co-worker with a felony DUI arrest," that he mishandled an assault call, and that he had intentionally adjusted his MACH unit to avoid tracking.

169. The rights recited in the November 11 notice substantially track Neb. Rev. Stat. § 13-3005, which requires every county sheriff to adopt rules governing the removal, suspension, or demotion of a nonprobationary peace officer. Those rules must provide written notice and a copy of the accusation, the right to representation, the right to be heard and present evidence, the right to record the proceedings, and a procedure to apply for an appeal.

170. Wurdeman received none of those protections required under Neb. Rev. Stat. § 13-3005 before his October 22 suspension or October 28 termination.

**M. Wurdeman's November 18, 2024 interview and nameplate removal**

171. On November 18, 2024, Wurdeman appeared at the CCSO for the noticed meeting.

172. Over roughly two and a half hours, in three sessions beginning at about 9:51 a.m., Wurdeman was questioned by Franklin and the County's outside counsel.

173. An attorney identified as "Christenson" attended in person, and Pam Bourne ("Bourne") of Woods Aitken LLP participated remotely.

174. At the November 18 Meeting, Wurdeman was accused for the first time of refusing to back up Hall on a call at a bar in Fairfield.

175. Wurdeman denied these allegations as he was in Sutton with Officer Sandoval at the time, Hall was surveilling a parked vehicle in Fairfield for a driver who had committed no observed offense, and Wurdeman had told Hall by radio to call him if he was needed.

176. Wurdeman told Franklin and Bourne that he wanted his certification unlocked, that he believed he was being retaliated against for the Jacobs report, the Julich matter, and his possible candidacy for Sheriff, and that he denied the accusations.

177. The County gave no written decision to Wurdeman after the meeting and no written notice stating how long the suspension would continue.

178. At 11:45 a.m. on November 18, 2024, between the second and third sessions, Wurdeman photographed the nameplate board in the CCSO office, which read: Jeff Franklin, Sheriff; Kreighton Baxter; Paul Fujan, Deputy; Dillon Hall; Isaiah Robbins. Wurdeman's nameplate had already been removed.

**N. December 17 to 20, 2024: notice on the afternoon before, a hearing of minutes, and termination the same day**

179. On the afternoon of December 17, 2024, Baxter emailed him a "Hearing Notice" signed by Franklin stating that a hearing "will be held on December 18, 2024, at 11am" to determine whether the allegations "support the discipline stated directly above," namely termination.

180. The notice was delivered to Wurdeman less than twenty-four hours before the hearing, during the week before Christmas.

181. The December 17 Notice disclosed for the first time that the investigation of Wurdeman began "[i]n response to Isaiah Robbins' report to Chief Deputy Kreighton Baxter that Wurdeman may be inaccurately recording his hours worked, the Sheriff and Baxter investigated your hours worked."

182. The December 17 Notice disclosed that during that investigation, Wurdeman "reported concerns of workplace harassment," that Zelle HR was then brought in, and that "additional concerns about [Wurdeman's] work conduct arose" during Zelle's investigation, which were attributed to statements by Robbins, Fujan, and Hall.

183. The accusations of failing to respond to calls and of refusing to back up a co-worker, which had appeared in the November 11 notice, no longer appeared as grounds for Wurdeman's termination.

184. The December 17 Notice asserted that between January and mid-October 2024 there were 47 occasions on which more than twenty minutes elapsed between Wurdeman's payroll clock-in and his radio call to dispatch, and 10 such occasions at the end of a shift, totaling "approximately 44 hours" from mid-July to mid-October.

185. The December 17 Notice treated each difference between those systems as unworked time without accounting for their different functions or determining whether Wurdeman was performing County work or on-call during the interval.

186. The December 17 Notice listed, as examples, September 25 through 30, 2024, including "09-30-24 – 2:06."

187. On September 30, 2024, Wurdeman and Deputy Robbins were attending a court-ordered deposition in a criminal case at the County Attorney's direction.

188. The witness paperwork for both deputies had been routed through the Sheriff's Office, and Baxter had texted Wurdeman about the court date beforehand.

189. The County nevertheless counted time Wurdeman spent at the deposition as time fraud.

190. The County did not treat the time Deputy Robbins spent at the same deposition as time fraud.

191. The December 17 Notice relied on Franklin's own testimony against Wurdeman.

192. Wurdeman had explained that some of the disputed time was spent in work conversations with Franklin, who frequently stopped at Wurdeman's home while Wurdeman was off duty or preparing for duty and discussed work along with personal subjects.

193. Franklin continued the visits and conversations even when Wurdeman gave short answers or said that he needed to work; on several occasions Wurdeman's wife called him away to end a visit.

194. The December 17 Notice recited that "Sheriff Franklin disputes this characterization," that Franklin "recall[ed]" the visits were on weekdays and about "weapons and home improvement projects," and that Franklin "denies stopping by your house on weekends."

195. The December 17 Notice then found that Wurdeman "lied and gave false or misleading information" about those conversations with Franklin.

196. According to the December 17 Notice, the Sheriff was at once the complaining witness, the fact-finder on his own credibility dispute with the accused, and the sole decision-maker.

197. The December 17 Notice characterized Wurdeman's discrepant forty-four hours as "falsification of time keeping records with intent to defraud,"

"dishonesty," providing "false and misleading information in connection to your benefits," conduct that "damaged your personal integrity and reputation among your peers, the Office, and the County as a whole," and a violation of the Code of Ethics provision against lying.

198. The December 17 Notice did not mention that the County had already rescinded Wurdeman's October suspension without pay and termination, restored his lost pay, and directed him to return to work.

199. On December 17, 2024, within hours of receiving the notice, Wurdeman's retained counsel, Drew A. Graham of Svehla Law Offices ("Graham") wrote to Franklin that neither he nor Wurdeman could appear on less than a day's notice, that the December 17 Notice did not allow time to prepare a response, and requested that the hearing be continued to the morning of December 26 or 27, 2024.

200. On December 18, 2024, Graham sent a formal written objection to the hearing on grounds of inadequate notice and a "predisposition toward termination," denied every allegation, identified the selective enforcement of timekeeping practices, demanded preservation of all timekeeping records for all deputies, and again requested a continuance to December 26 or 27.

201. The County did not continue the hearing to a date counsel could attend with preparation and instead rescheduled the hearing to December 20, 2024, at 2:30 p.m.

202. Graham's written objection and response were the only response Wurdeman was able to make.

203. The hearing began at approximately 2:35 p.m., on December 20, 2024, and lasted approximately nine minutes.

204. At the hearing Graham directed Franklin that all further communication with Wurdeman was to go through counsel.

205. The same afternoon Franklin signed and sent Wurdeman a letter stating in its entirety: "Thank you for coming in for our meeting today, 12/20/2024 at 2:30pm. After taking into account all of the investigative information, I have made a decision to end your employment with Clay County Sheriff's Office effective today." The letter stated no finding and no reason. Within hours Franklin called, texted ("Please call me"), and emailed Wurdeman directly, disregarding counsel's instruction.

206. The December 17 Notice stated that the Sheriff's decision could be appealed pursuant to the County Grievance Procedure, but the December 20 termination letter stated no findings or reasons and gave no appeal instructions.

207. Wurdeman's October 28 grievance had denied the same core accusations asserted in the December 17 Notice, invoked the Grievance Procedure, and demanded reinstatement and removal of the discipline from Wurdeman's personnel file.

208. Arndt responded that a Grievance Board would be convened, requested two proposed members and available dates, and received Wurdeman's prompt response.

209. The County never convened that Board or identified its chair or members.

210. Instead, the Sheriff rescinded the first discipline against Wurdeman and immediately reimposed the same core accusations through paid administrative leave.

211. No County Grievance Board reviewed Wurdeman's final termination.

**O. After the termination: certification proceedings and professional harm**

212. On January 28, 2025, the Executive Director of the Nebraska Commission on Law Enforcement and Criminal Justice (the "Commission") sent Wurdeman notice of an informal revocation complaint in LR-297-25. The notice stated that the complaint was based on information in the CCSO's "791" report.

213. The Commission's complaint against Wurdeman repeated the County's allegations that "an internal investigation found that Deputy Wurdeman falsely claimed and was compensated for unworked overtime," and that he "repeatedly and knowingly deactivated his MACH tracking system while in an on-duty status in order to conceal his location."

214. The Commission sent Wurdeman a form consenting to revocation and waiving hearing, which he did not sign.

215. Through counsel, Wurdeman denied the allegations in a written response received by the Commission on February 18, 2025.

216. As of the filing of this Complaint, Wurdeman's law-enforcement certification remains locked by the Commission based on the County's report.

217. On August 1, 2025, the Commission's Executive Director advised Wurdeman that review was complete and that he would request that the Nebraska Attorney General file and prosecute a formal revocation complaint.

218. The August 1, 2025 Letter identified the matter as LR-297-24, while the January 28 notice identified it as LR-297-25.

219. As of October 19, 2026, Wurdeman has received no public certification hearing and no final revocation order had issued.

220. On October 5, 2026, Wurdeman, through counsel, demanded that the Commission remove the lock of his certification and dismiss the unresolved matter or promptly file any formal complaint, set a hearing, and issue a written decision because the lock prevents Wurdeman from being employed as a law-enforcement officer in Nebraska and from performing armed-security work that depends on active law-enforcement employment. Wurdeman's demand sought dismissal first, requested a hearing in the alternative, and expressly preserved objections to the timing and basis of the prosecution.

221. On October 19, 2026, the State filed a formal revocation complaint in LR-297-25 and issued notice setting a public hearing before the Police Standards

Advisory Council for December 16, 2026, at the Nebraska Law Enforcement Training Center in Grand Island.

222. Paragraph 7 of the Commission's formal complaint alleges that the Executive Director received the informal complaint on December 20, 2024. Paragraph 10 alleges that Investigator Gary Reed completed the Commission investigation on September 12, 2025. These are the dates the State pleads. The notice and complaint do not resolve Wurdeman's demand for statutory closure or removal of the employment restriction.

223. The Commission's formal complaint again relies on the County's separation report and timekeeping accusations.

224. The Commission's formal complaint alleges that Wurdeman's employment ended October 28, 2024, without stating that Franklin rescinded that termination on November 7. The County has not corrected or withdrawn the report, and its accusations remain before the State as grounds for revocation while Wurdeman is barred from the law-enforcement employment described below.

225. The Sutton Police Department made Wurdeman a conditional offer of employment as a police officer on January 13, 2025, at compensation of approximately $70,000.

226. To Wurdeman's present knowledge the Sutton offer remains available, but Wurdeman cannot accept it while his certification is locked.

227. As a result of the certification lock, Wurdeman has also lost approximately $3,700 per year in FFA Security work requiring active law-enforcement employment.

228. The County's accusations of dishonesty, time theft, and concealment have circulated in the department and the community.

229. In January 2025 a CCSO employee messaged Wurdeman calling him a "backstabbing" "rat" who had been "fired" for the same misconduct he had reported in others.

230. The County has never provided Wurdeman a public hearing at which he could answer and clear the stigmatizing charges it placed into the state certification process.

**P. The County's stated reason for disciplining Wurdeman was pretext**

231. Clocking into the payroll system before announcing availability to dispatch was a common, longstanding, known, and tolerated practice within the CCSO.

232. Deputies other than Wurdeman similarly had payroll and radio or MACH timestamps that did not always match, and the County did not treat those variances as fraud or impose comparable discipline.

233. Baxter texted the deputies on May 29 and June 20, 2024, asking them to go to his house while on duty to feed, water, and let out his dog over a four-day period, with feeding instructions.

234. In the spring of 2024 Baxter routinely went home within an hour of starting his shift and again at mid-shift, for hours at a time, and on several occasions parked at his residence until the end of shift before clocking out.

235. On October 28, 2024, and again on November 6, 7, 8, and 12, 2024, Baxter used his marked patrol vehicle to take his children to Sutton Elementary School while on duty; photographs and video show the vehicle in the school drop-off line with a child unrestrained in the front seat.

236. The County's Handbook permits personal use of County vehicles "only when they are on call and only after notifying the County Sheriff/Supervisor."

237. Baxter was not disciplined for any of these violations.

238. Hall routinely sat at home for hours during his shifts, including six hours of a ten-hour shift, and disconnected his MACH unit while at home. Wurdeman documented this conduct with a screenshot from the County's MACH system and reported it to Baxter in writing.

239. Hall was never disciplined, and the County did not report him to the State.

240. The MACH connectivity failures Wurdeman was accused of fabricating were a known, department-wide problem

241. Upon information and belief, Robbins and Hall experienced the same failures.

242. In April 2025 Fujan opened a County information-technology ticket for Hall's and another deputy's in-car tablets describing "intermittent but persistent

connectivity problems, specifically in the GPS location," in which the MACH system "will not recognize their GPS location at all" or "lose[s] location tracking."

243. Robbins and Hall were not accused of deactivating the system to conceal their locations.

244. Franklin himself routinely visited Wurdeman's home while Wurdeman was off duty or preparing for duty, mixed work subjects with personal conversation, and continued talking after Wurdeman said he needed to work or stopped engaging.

245. On several occasions Wurdeman's wife called him away to end the visit.

246. Jacobs, the subject of Wurdeman's NSP report, was kept on the road during a second domestic-abuse investigation despite the earlier child-safety incident and, when finally suspended, was paid to sit in the office.

247. The County's explanation for taking action against Wurdeman shifted over time:

a. On October 22, 2024, the accusations against Wurdeman concerned clock-in times and MACH data.

b. On October 28 the accusations against Wurdeman were limited to timekeeping only, and the County conceded some of the hours were training.

c. On November 7 the Sheriff rescinded Wurdeman's suspension and first termination, restored 100 hours of back pay, and directed him to return to work.

d. On November 11 the County's accusations against Wurdeman expanded to refusing backup and mishandling an assault call.

e. On December 17 the County's expanded November 11 accusations against Wurdeman disappeared and the County's accusation became "dishonesty" and "intent to defraud," resting on the Sheriff's own testimony, where the County inferred fraud from timestamps produced by systems that measured different events, while not applying that inference to other deputies' comparable variances.

f. The one week of "examples" the County chose to list included a day Wurdeman spent in a deposition at the County Attorney's request.

248. Baxter had a personal interest in removing a prospective opponent, Wurdeman, and he acted on it.

## Q. Municipal liability

249. Nebraska law gives the elected Sheriff the power to appoint deputies and revoke their appointments in writing. Neb. Rev. Stat. § 23-1704.01.

250. Nebraska law also directs each county sheriff to adopt rules governing removal, suspension, and demotion of nonprobationary peace officers, including an appeal procedure. Neb. Rev. Stat. § 13-3005.

251. Since 1992, it has been settled law within the Eighth Circuit that a Nebraska sheriff may possess final policymaking authority sufficient to impose county liability for terminating a deputy because of protected speech. Buzek v. County of Saunders, 972 F.2d 992, 996 (8th Cir. 1992).

252. A single deliberate decision by an official with final policymaking authority is municipal policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986).

253. The County Handbook separately states that a Grievance Board's decision is final.

254. Franklin exercised final, unreviewed authority over the CCSO report about Wurdeman that was made to the State in connection with Wurdeman's separation.

255. Franklin caused or authorized the report about Wurdeman, selected or approved the accusations it conveyed, and left them in place after he rescinded Wurdeman's suspension and first termination.

256. The Handbook's grievance process addresses employment discipline; it does not assign any County body authority to review, alter, or withdraw a CCSO separation report to the State.

257. Franklin's reporting decision was therefore County policy for that function and directly caused Wurdeman's certification lock and resulting injury to Wurdeman.

258. Franklin exercised final authority in practice over deputy discipline. He decided each suspension and termination and identified himself as the official who would decide discipline “ranging from none up to termination.”

259. Although the Handbook described a Grievance Board whose decision would be final, the County never convened that body after Wurdeman invoked the procedure, proposed members, and supplied dates, and no County body independently reviewed or altered Franklin’s final termination decision.

260. The challenged course was carried out through County institutions and with notice to County leadership.

261. County Board President Johnson had actual notice of Wurdeman’s retaliation claim before Wurdeman’s first termination and Johnson told Wurdeman that he would be fired.

262. The County’s retained HR agent participated in Wurdeman’s unpaid suspension and first termination, undertook to convene the Grievance Board, and led the renewed investigation against Wurdeman.

263. County-retained counsel conducted the November 18 interview and participated in the December process involving Wurdeman.

264. The County Clerk implemented payroll and leave functions related to Wurdeman.

265. The County then continued to adhere to the separation report after Wurdeman’s first discipline was rescinded and after receiving Wurdeman’s and counsel’s written objections.

266. The County's use of retained HR personnel does not break the causal chain. The County directed employees to Zelle for HR and leave administration; authorized Arndt to conduct the October 22 meeting; implemented the suspension Arndt prompted Baxter to impose; included Arndt in the October 28 termination call; assigned her the grievance process; and used Zelle's investigation to develop the accusations presented in December.

267. Franklin and Baxter accepted and implemented Zelle and Arndt's work as the County's own employment process.

268. Franklin also adopted and implemented Baxter's conduct. Franklin knew that Baxter was the prospective candidate he and Julich backed to succeed him; was present when Wurdeman's October 28 grievance was read; adopted the timekeeping accusations against Wurdeman; rescinded Wurdeman's initial discipline and then reimposed discipline against Wurdeman on the same core facts; presided over the final hearing; and made the final decision to terminate Wurdeman's employment.

269. Wurdeman's written March 2024 complaint about Hall's time abuse, supported by MACH documentation, was received by Baxter and not acted upon; Baxter's own conduct was not investigated; Robbins's complaint about Wurdeman was investigated within weeks.

270. Franklin and Baxter tolerated on-duty absences and timekeeping irregularities by favored deputies and supervisors, but characterized disputed

time by Wurdeman, after Wurdeman had reported misconduct and expressed interest in running for Sheriff, as "fraud."

**R. Damages**

271. As a direct and proximate result of Defendants' conduct, Wurdeman has lost his salary and benefits as a deputy sheriff, including retirement contributions and health insurance; has been barred by the Commission's certification lock from law-enforcement employment in Nebraska, including an approximately $70,000-per-year conditional offer from the Sutton Police Department made in January 2025; and has lost approximately $3,700 per year in armed private-security work.

272. As a direct and proximate result of Defendants' conduct, Wurdeman has also incurred expenses responding to the County's accusations in his certification proceeding. The continuing employment restriction has extended his loss of income.

273. Wurdeman has suffered political and reputational harm that impaired his contemplated candidacy for Sheriff in 2026.

274. Wurdeman has suffered damage to his professional reputation and standing in his community.

275. Wurdeman has suffered humiliation, emotional distress, and severe stress on himself and his family, including during his wife's pregnancy.

## COUNT I

### 42 U.S.C. § 1983: First Amendment Retaliation (Speech to the Nebraska State Patrol)

*Against Franklin and Baxter in their individual capacities and against Clay County*

276. Plaintiff incorporates the allegations in Parts I through IV.R that concern his June 27, 2024 speech to NSP and Defendants' ensuing knowledge, motive, and adverse actions.

277. Wurdeman's June 27, 2024, communications with NSP concerning the June 2023 child-safety incident, Jacobs's failure to intervene, and the CCSO's handling of that matter were speech by a citizen on matters of public concern.

278. Wurdeman's speech was made to an outside agency, outside the chain of command, while he was off duty, unpaid, and out of uniform, using his personal vehicle and phone, in response to that agency's request, without a CCSO assignment or approval, and outside the ordinary scope of his duties as a road deputy.

279. Although Wurdeman learned the underlying facts through his employment, responding to NSP's inquiry was outside his ordinary job duties. He spoke as a witness to events he had observed, without an assignment to investigate or report on Jacobs for the CCSO.

280. Wurdeman's interest in reporting suspected unlawful conduct by a public official to the agency charged with investigating it, and the public's interest in receiving that information, outweighed any interest of the County in restricting Wurdeman's protected speech.

281. Wurdeman's protected speech caused no disruption of the Sheriff's Office; rather, any disruption was caused by Julich's and Baxter's response to Wurdeman's protected speech.

282. Julich confronted Wurdeman about the NSP meeting on July 1, 2024, in front of the dispatch office and again at Wurdeman's home on July 12, 2024.

283. Franklin told Wurdeman's father that Franklin had Julich "keeping [Wurdeman] in line."

284. Baxter told Wurdeman his complaint about Julich's retaliation would not "fly."

285. At the August 28 meeting, Franklin expressly tied Wurdeman to the Jacobs issue: "You were pushing what Jacobs was doing wrong." That direct acknowledgment and the July confrontations were followed by exclusion from training, suspension without pay, termination, the report to the State, paid administrative leave, and final termination.

286. Defendants took adverse actions that would chill a person of ordinary firmness from continuing to speak by excluding Wurdeman from training, suspending Wurdeman without pay, terminating Wurdeman's employment on October 28, 2024, reporting Wurdeman to Commission on or about October 30, 2024, keeping Wurdeman from returning to duty through paid administrative leave beginning November 11, and terminating Wurdeman again on December 20, 2024.

287. Wurdeman's protected speech was a substantial or motivating factor in each adverse action taken by Defendants.

288. The pretextual character of the County's stated reasons, including Defendants' treatment of separate payroll and dispatch systems as though they recorded the same event, the selective investigation of Wurdeman for variances tolerated in other deputies, the departure from the County's own procedures, the shifting explanations, the disparate treatment of Hall, Baxter, and Jacobs, and the sequence of events alleged above support an inference that the County's motivation for taking action against Wurdeman was retaliatory.

289. Franklin and Baxter acted under color of state law. They are not entitled to qualified immunity because, by 2024, the Eighth Circuit had clearly established that law-enforcement officers speaking as citizens outside their regular duties about public corruption, workplace misconduct, and investigative failures could not be terminated for that speech absent a sufficient, specific showing of operational disruption. Noon v. City of Platte Woods, 94 F.4th 759, 763–67 (8th Cir. 2024).

290. The County's own Handbook likewise promised that employees "are protected from victimization, harassment, or disciplinary action as a result of any disclosure, where the disclosure is made in good faith."

291. The County's retained HR agent had actual written notice by August 9, 2024, that Wurdeman had spoken with NSP and alleged retaliation for doing so.

292. Arndt communicated with Franklin about Wurdeman's retaliation complaint and then participated with Baxter and Franklin in his unpaid suspension, first termination, promised grievance process, renewed investigation, and final termination.

293. The County's adverse actions were part of the same employment process and support the inference that Defendants acted with knowledge of Wurdeman's protected speech and written retaliation complaint.

294. Franklin and Baxter each personally participated in the retaliatory conduct against Wurdeman.

295. Baxter controlled training, investigated Wurdeman's disputed time, imposed Wurdeman's unpaid suspension, and initiated Wurdeman's first termination.

296. Franklin knew of Wurdeman's protected speech and retaliation complaint, adopted the accusations against Wurdeman, caused or authorized the report about Wurdeman to the State, reimposed discipline after rescinding the initial suspension and termination, and made the final decision to terminate Wurdeman's employment.

297. Franklin's and Baxter's conduct directly and proximately caused Wurdeman's injuries.

298. Clay County is liable because Franklin exercised final policymaking authority over deputy termination and the CCSO's separation report, and because the County adopted and implemented the challenged decisions through its Sheriff,

retained HR agent, counsel, payroll and leave functions, and unfulfilled grievance process.

299. As a direct and proximate result of Defendants' conduct, Wurdeman suffered damages from lost wages and benefits, lost future earning capacity, sustained damage to his professional reputation, and suffered humiliation and emotional distress.

300. Franklin's and Baxter's conduct was malicious and in reckless disregard of Wurdeman's federally protected rights, entitling Wurdeman to punitive damages against Franklin and Baxter, individually.

## COUNT II

### 42 U.S.C. § 1983: First Amendment Retaliation (Political Speech and Prospective Candidacy)

*Against Clay County*

301. Plaintiff incorporates the allegations in Parts I through IV.R that concern his political speech and prospective candidacy and Defendants' ensuing knowledge, motive, and adverse actions.

302. Wurdeman's statements, to county residents who had encouraged him to run and to Franklin on August 28, 2024, that he was considering running for Clay County Sheriff were speech and association as a citizen on a matter of public concern.

303. Wurdeman's conversations with residents occurred off duty and outside his official role.

304. Who will hold the county's chief law-enforcement office is a matter of public concern of the first order; the decision whether to seek that office, and the discussion of that decision with the electorate, is political expression and association at the core of the First Amendment.

305. Nebraska law protects political-subdivision employees' political activity outside office hours and official duties, and the County's own Handbook prohibits political coercion and protects respectful, non-disruptive political expression. See Neb. Rev. Stat. § 20-160.

306. Neither Defendants' notices nor the alleged facts contained therein identified any disruption caused by Wurdeman's protected speech.

307. After Wurdeman disclosed his prospective candidacy on August 28, 2024, Baxter excluded him from Taser training on September 17 and active-shooter training on October 4.

308. After Wurdeman disclosed his prospective candidacy on August 28, 2024, the County suspended him without pay on October 22, fired him on October 28, and reported him to the State and Commission by October 30, locking his law-enforcement certification. By October 27, 2024, before any announced decision, the President of the County Board, Johnson, told Wurdeman that he would be fired while also summarily dismissing Wurdeman's candidacy for Sheriff, saying "we all know that is not true."

309. Wurdeman's protected political speech and association were a substantial and motivating factor in the adverse actions taken by the County, as alleged above.

310. The same pretext, procedural irregularity, disparate treatment, and sequence support an inference that the County's motive for its adverse actions against Wurdeman was retaliatory.

311. The County's retaliatory acts against Wurdeman included not only the suspensions and terminations but the escalation of a disputed timekeeping practice into charges of "fraud," "dishonesty," and lying; the report of those charges to the State's certification agency two days after Wurdeman's first termination and before any hearing; and the failure to correct the report after the Sheriff rescinded Wurdeman's discipline on which it was based.

312. Defendants never asserted contemporaneously that Wurdeman's interest in the office threatened the discipline, harmony, or operation of the Sheriff's Office. Instead, every stated ground relied upon by the County concerned timekeeping, dishonesty, or related performance allegations, and Wurdeman's final termination letter stated no ground at all.

313. Franklin had encouraged multiple deputies to run and identified no disruption from Wurdeman's protected speech.

314. Franklin knew of Wurdeman's prospective candidacy because Wurdeman told him directly on August 28, 2024.

315. Franklin had already identified Baxter as a possible candidate, and Baxter had reported that Franklin and Julich were backing him.

316. Baxter controlled Wurdeman's access to training, imposed the unpaid suspension, and initiated Wurdeman's first termination.

317. Franklin adopted the accusations against Wurdeman, caused or authorized the state report about Wurdeman, reimposed discipline against Wurdeman, and made the final decision to terminate Wurdeman's employment.

318. The deliberate acts of Franklin and Baxter are attributable to the County on the alternative grounds alleged, above.

319. The County is liable for the retaliation against Wurdeman.

320. As a direct and proximate result of Defendants' conduct, attributable to the County, Wurdeman suffered damages from lost wages and benefits, lost future earning capacity, sustained damage to his professional reputation, and suffered humiliation and emotional distress.

## COUNT III

### 42 U.S.C. § 1983: Fourteenth Amendment Procedural Due Process (Liberty; Stigma-Plus)

*Against Franklin, in his individual capacity, and Clay County*

321. Plaintiff incorporates the allegations in Parts I through IV.R that concern the stigmatizing charges, their publication in connection with his termination, the resulting employment bar, and his demands for a name-clearing hearing.

322. Wurdeman has a constitutionally protected liberty interest in his good name, reputation, honor, and integrity and in his freedom to pursue his chosen profession.

323. A public employee states a liberty-interest claim when, in connection with discharge, a public official makes false public charges of dishonesty, immorality, or criminality that seriously damage the employee's standing or foreclose other employment opportunities, and the employer denies a requested name-clearing hearing. Board of Regents v. Roth, 408 U.S. 564, 573–74 (1972); Stodghill v. Wellston School District, 512 F.3d 472, 476–77 (8th Cir. 2008).

324. In connection with Wurdeman's termination, Franklin and the County charged him with "falsification of time keeping records with intent to defraud," "dishonesty," having "lied," and having "repeatedly and knowingly deactivated his MACH tracking system … in order to conceal his location."

325. Those are charges of dishonesty and fraud that go to the core of a law-enforcement officer's fitness, and they were the stated grounds for Wurdeman's December 20 termination.

326. The County's central premise—that differences among payroll, radio, and MACH timestamps proved unworked time—was false. The systems recorded different events, and no written CCSO policy required their timestamps to match.

327. Among the forty-seven "instances" cited by the County was September 30, 2024, a day on which Wurdeman and Robbins were attending a court-ordered

deposition at the County Attorney's direction; their witness paperwork was routed through the Sheriff's Office, and Baxter texted Wurdeman about the date.

328. The County conceded on October 28 that some of the hours it had counted were County-assigned training; the MACH connectivity failures attributed to deliberate concealment were a known, department-wide equipment problem for which the County opened an information-technology ticket; and the Sheriff rescinded the October suspension and termination before reimposing discipline based on the same core accusations.

329. The CCSO published the charges outside the Sheriff's Office through its official report to NLETC.

330. The January 28, 2025 Commission notice states that the informal complaint was based on information in the CCSO's "791" report and repeats the accusations that Wurdeman falsely claimed pay for unworked time and knowingly deactivated MACH tracking to conceal his location. The October 19, 2026 formal complaint again relies on the County's accusations and separation report.

331. NLETC's October 30 letter advised that prospective law-enforcement employers would receive access to the records underlying the report.

332. The County chose the content of its report, caused the stigmatizing charges to enter the State's certification process, and has not corrected or withdrawn the report.

333. The 'plus' factor is the termination of Wurdeman's employment together with the statutory hiring bar the County's report triggered. Nebraska law

prohibits a prospective law-enforcement employer from hiring an officer whose former employer reported a separation under circumstances that may justify revocation unless the Commission has reviewed the report and determined that the officer retains his certification. Neb. Rev. Stat. § 81-1414.11(5). That bar has prevented Wurdeman from accepting the Sutton Police Department's January 13, 2025 conditional offer of approximately $70,000 per year and from performing approximately $3,700 per year in security work requiring active law-enforcement employment.

334. Wurdeman repeatedly denied the stigmatizing charges and invoked the process for correcting them.

335. On October 22, 2024, Wurdeman denied the accusations and asked for the supporting documents so he could respond.

336. Wurdeman's October 28 written grievance denied the accusations, invoked the Grievance Procedure, and demanded reinstatement and removal of the discipline from his personnel file.

337. Arndt responded that a Grievance Board would be convened and asked for proposed members and dates.

338. Wurdeman promptly supplied members and dates, and the County never convened the Board.

339. On November 18, Wurdeman again denied the accusations and asked the Sheriff and County counsel to obtain release of the certification lock.

340. On November 26 Wurdeman wrote to the NLETC Director disputing the charges and explaining their origin.

341. Wurdeman's counsel's December 18 and December 20 letters denied every allegation, objected that the outcome was predetermined, and demanded a meaningful opportunity to respond.

342. Through counsel, Wurdeman denied the Commission allegations in the written response received February 18, 2025.

343. On October 5, 2026, through counsel, he again demanded that the County complete the Step 3 appeal and separately provide a public, post-termination name-clearing hearing before a neutral decision-maker.

344. Wurdeman's renewed demand for a hearing expressly denied the accusations of fraud, dishonesty, false time records, and intentional concealment and requested a public record of his rebuttal for those who received the accusations.

345. Wurdeman's October 5 Demand for Hearing supplements, and does not replace, his October 2024 grievance and the County's unfulfilled promise to convene a Grievance Board.

346. The approximately nine-minute December 20 Proceeding was a pretermination disciplinary meeting, not a public hearing directed to correcting the charges in the personnel and state records;

347. The December 20 Proceeding was presided over by the accuser whose credibility was in dispute and followed by a termination letter with no findings.

348. The October 19 notice sets a December 16, 2026 hearing on the State's request to revoke Wurdeman's certification. That hearing has not occurred. The notice contains no decision correcting the County's report or personnel file and no disposition of his separate demand for a public name-clearing hearing from the County. The County's accusations remain uncorrected, and the employment restriction and resulting harm continue.

349. Franklin made the decision to terminate Wurdeman, caused or authorized the report made in connection with the termination, and has not provided a public name-clearing hearing—all under color of state law.

350. By 2024, it was clearly established that a discharged public employee who disputes stigmatizing public charges of dishonesty made in connection with the discharge may request and receive a name-clearing hearing. Board of Regents v. Roth, 408 U.S. 564, 573 & n.12 (1972); Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476–77 (8th Cir. 2008).

351. The County is liable because Franklin exercised final authority over Wurdeman's termination and the CCSO's report to the State, and no County body reviewed or corrected those decisions after Wurdeman invoked the County's grievance process.

352. The County's own HR agent treated the October 28 writing as a grievance, promised Wurdeman a Grievance Board, requested proposed members and dates, and received Wurdeman's response.

353. The County never convened the promised Board and reimposed the same core charges, terminated Wurdeman, and left the stigmatizing state report in place.

354. No County body has heard and decided Wurdeman's challenge to the truth of those charges or given him a public forum in which to clear his name.

355. As a direct and proximate result of Franklin's and the County's conduct, Wurdeman has suffered lost wages and benefits, lost future earning capacity, damage to his professional reputation, humiliation, and emotional distress.

356. Franklin acted maliciously and in reckless disregard of Wurdeman's federally protected rights, entitling Wurdeman to punitive damages against Franklin in his individual capacity.

357. As a direct and proximate result of the County's conduct, Wurdeman seeks prospective relief against Clay County requiring a public name-clearing hearing and correction or withdrawal of the County's reports to the State.

## COUNT IV

### Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1)
### Denial of FMLA Entitlements
*Against Clay County*

358. Plaintiff incorporates the allegations in Parts I through IV.R that concern his October 22, 2024 leave request, the County's notice and response, the birth of his child, his termination, and resulting damages.

359. Clay County is a public agency and covered employer under 29 U.S.C. § 2611(4).

360. Wurdeman was employed by the County for more than twelve months and worked more than 1,250 hours in the twelve months preceding his request for covered leave.

361. On information and belief, when Wurdeman gave notice the County, counting the employees of its departments and elected offices as one public-agency employer, employed at least fifty employees within seventy-five miles of Wurdeman's worksite.

362. Wurdeman was therefore an eligible employee under 29 U.S.C. § 2611(2) and 29 C.F.R. § 825.110(a).

363. Wurdeman expected the birth of his child on December 6, 2024, and needed leave for the birth and to care for and bond with the newborn, a qualifying reason under 29 U.S.C. § 2612(a)(1)(A).

364. On October 22 he went to the County Clerk's office, explained the anticipated birth, and asked for the forms needed to arrange protected leave.

365. The County directed him to its designated outside-HR agent, Zelle.

366. Wurdeman immediately called the number provided by the County and left a voicemail explaining his need for leave.

367. An employee need not invoke the FMLA by name or use a particular form, and Wurdeman used the precise notice channel the County supplied.

368. Wurdeman's request therefore gave the County notice of potentially qualifying leave and triggered the County's duty to provide eligibility and rights-and-responsibilities notices.

369. The County returned no call, supplied no forms, and provided no notice in response to Wurdeman's request.

370. Wurdeman's son was born on November 21, 2024. Wurdeman's requested birth-and-bonding leave began with the birth, and he intended to use approximately 115 accrued sick-leave hours concurrently with FMLA leave.

371. The County never processed or designated Wurdeman's protected leave and never provided the required notices to Wurdeman.

372. On December 20—twenty-nine days after Wurdeman's child's birth and during the period for which Wurdeman had sought protected leave—the County terminated him instead of preserving his leave and restoration rights.

373. Had the County processed and designated the leave, Wurdeman's protected bonding leave extended beyond December 20 and carried a statutory right to restoration.

374. The County's failures deprived Wurdeman of the ability to make informed leave arrangements, to use accrued leave with FMLA protection, and to return to employment after protected leave, causing lost wages and benefits.

375. The County's violation was willful within the meaning of 29 U.S.C. § 2617(c)(2), making the FMLA's three-year limitations period applicable.

376. The County had previously administered Wurdeman's FMLA leave from October 2020 through January 2021.

377. The County's Clerk's-office employee recognized Wurdeman's October 22 request as an HR matter and directed Wurdeman to the County's designated outside-HR agent; and that agent actively administered Wurdeman's employment process the same day and thereafter.

378. The County nevertheless did not return Wurdeman's call, provide required notices, or process the request before terminating him.

379. As a direct and proximate result of the County's willful conduct, Wurdeman suffered damages including lost wages and benefits, interest, an equal amount as liquidated damages.

380. As a direct and proximate result of the County's willful conduct, Wurdeman is entitled to equitable relief including reinstatement or front pay, and attorney's fees and costs under 29 U.S.C. § 2617(a).

## COUNT V

**Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1)**
**Discrimination for Exercising FMLA Rights**
*Against Clay County*

381. Plaintiff incorporates the allegations in Parts I through IV.R that concern his exercise and attempted exercise of FMLA rights, the County's notice and response, the adverse actions, pretext, and resulting damages.

382. Wurdeman engaged in protected activity when he notified the County on October 22, 2024, that he needed leave for the anticipated birth of his child and to care for and bond with the child after birth.

383. The protected leave period Wurdeman had requested began on November 21, 2024, when his child was born.

384. The County subjected Wurdeman to materially adverse action after receipt of that notice by suspending him without pay later the same day, failing to process or designate the requested leave, keeping him from returning to duty, and terminating him twenty-nine days after the child's birth and during the period for which he had requested bonding leave.

385. The County received notice of Wurdeman's request for protected leave through its designated outside-HR channel before his suspension.

386. The County's outside-HR operation participated in Wurdeman's suspension meeting later that day and remained involved in Wurdeman's employment process through his final termination.

387. Wurdeman's same-day suspension, the County's complete failure to respond to his leave request, his termination during the requested leave period, and the short interval between these events support a reasonable inference that his attempted exercise of FMLA rights was a motivating factor in the County's adverse actions.

388. The County relied on timestamps from systems that measured different events, selectively investigated Wurdeman for practices tolerated in

other deputies, counted County-assigned training and a court-ordered deposition as unworked time, attributed known equipment failures to intentional concealment, shifted and expanded its accusations against Wurdeman, rescinded Wurdeman's first suspension and termination, and issued Wurdeman's final termination letter without findings or reasons.

389. As alleged above, the County's stated reasons for its adverse actions against Wurdeman were pretextual and the County would not have taken the same actions against Wurdeman for reasons unrelated to his requested leave.

390. By taking adverse action because Wurdeman attempted to exercise rights to which he was entitled under the FMLA, the County discriminated against Wurdeman in violation of 29 U.S.C. § 2615(a)(1).

391. As a direct and proximate result of the County's conduct, Wurdeman has suffered damages including lost wages and benefits, interest, and liquidated damages.

392. As a direct and proximate result of the County's conduct, Wurdeman is entitled to equitable relief, attorney's fees, and costs available under 29 U.S.C. § 2617(a).

## VI. PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against Defendants, jointly and severally as the law allows, and award:

a. Compensatory damages against all Defendants, as allowed on the respective claims, for lost wages and benefits, lost future earning

capacity, damage to reputation, emotional distress, and other pecuniary loss caused by their conduct, including harm sustained before any later hearing or correction, in an amount to be proven at trial;

b. Punitive damages against Franklin and Baxter in their individual capacities on Count I and against Franklin in his individual capacity on Count III;

c. Back pay;

d. Reinstatement to his position as a deputy sheriff or, in the alternative, front pay;

e. An order directing Clay County to withdraw or correct the Change in Status report and any other report or attestation concerning Wurdeman submitted to the Nebraska Law Enforcement Training Center or the Nebraska Commission on Law Enforcement and Criminal Justice;

f. An order directing Defendant Clay County to remove the disputed discipline from Wurdeman's personnel file and provide Wurdeman a name-clearing hearing before a neutral decision-maker;

g. Liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii);

h. Attorney's fees and costs under 42 U.S.C. § 1988 and 29 U.S.C. § 2617(a)(3);

i. Pre-judgment and post-judgment interest as allowed by law; and

j. Such other relief as the Court finds just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to NECivR 40.1(b), Plaintiff designates Lincoln, Nebraska, as the place of trial.

Dated: October 22, 2026.

TERRANCE W. WURDEMAN, Plaintiff,

By: /s/ Paul D. Heimann
Paul D. Heimann, NE Bar No. 21727
THE ORR LAW GROUP, LLC
9375 Burt Street, Suite 200
Omaha, Nebraska 68114
(402) 968-0226
PaulH@orrlawgrp.com
Attorney for Plaintiff